**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**LARRY C.,**

                **Plaintiff,**

      **v.**                                **Civil Action 2:21-cv-2243**
                                                **Judge Algenon L. Marbley**
                                                **Magistrate Judge Jolson**

**COMMISIONER OF
SOCIAL SECURITY,**

                **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Larry C., brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB").   For the reasons set forth below, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

## I.      BACKGROUND

On July 25, 2018, Plaintiff protectively filed an application for DIB alleging disability beginning November 24, 2017, due to functional neurological symptom disorder/mixed symptoms, functional neurological symptom disorder with mixed symptoms, chronic fatigue syndrome, bowel incontinence, unspecified anxiety disorder, functional memory problem, urinary incontinence, rectal spasms, high blood pressure, and sleep apnea.  (Tr. 194–95, 223).  After his application was denied both initially and on reconsideration, the Administrative Law Judge (the "ALJ") held a hearing on July 14, 2020.  (Tr. 41–66).  The ALJ denied Plaintiff's application in a written decision on July 27, 2020.  (Tr. 12–40).  When the Appeals Council denied review, that denial became the final decision of the Commissioner.  (Tr. 1–6).

Plaintiff filed the instant case seeking a review of the Commissioner's decision on May 3, 2021 (Doc. 1), and the Commissioner filed the administrative record on September 7, 2021 (Doc. 7).  The matter has been briefed and is ripe for consideration.  (Docs. 10, 11, 12).

### A.    Relevant Hearing Testimony

The ALJ summarized the testimony from Plaintiff's hearing:

> [Plaintiff] testified that with even the movement of eating, he can lose control of his body, has body weakness, and gets out of breath. He alleged tremors helped with medication. He said he is almost unable to take care of himself as far as personal care (using the toilet, showering, eating), and showers on a stool less frequently due to exhaustion and being out of breath. He said he has spotted vision, sometimes sees double, and intermittent hallucinations. He said he frequently but intermittently cannot use his hands and arms to grip, hold things, and struggles to type on an iPad. He said he has daily problems with his legs more frequently with movement. He said he struggles to walk to use the bathroom. He said he now has a cane for balance and support due to lack of strength. He said he worries that he may fall and impale himself on it considering how often he falls. He said he uses it to go to the restroom. He said his urinary incontinence daily and bowel incontinence 1-2 times weekly. As for his mental health, he started seeing mental health in July 2016, seeing a psychiatrist monthly and a therapist weekly. He said he suffers from depression and anxiety resulting from his physical illness on a daily basis. He said he treats with medications. He said he had suicidal ideation at his worst three times a week. He said he has problems with attention, concentration and memory. He said he forgets entire conversation and important dates. He alleged that he sleeps the majority of the day after taking his morning medications said he sits, eats and sleeps half the day or not more. He said he takes Ritalin to help with morning energy but then stopped this when ineffective. He alleged fatigue the longer he tries to move. He said he gained weight shortly after being on short-term disability. As for his agoraphobia, this lasted 8 months, improved with treatment, with very few and far between residual issues. He alleged that he leaves his home only for doctors' appointments.

(Tr. 21).

### B.    Relevant Medical Evidence

The ALJ also usefully summarized Plaintiff's medical records and symptoms related to his physical impairments:

> . . . While still working, he complained of facial drop and left arm numbness, (23F/28), but his follow-up brain magnetic resonance imaging and head computed tomography were negative (3F/13, 23F/54). [Plaintiff] had normal thyroid results

(19F/12). His 10-16 electromyogram was normal objectively although claimant began experiencing subjective paresthesia/shortness of breath toward the end of the procedure (3F/17). His 12-16 electromyogram with autonomic study, tilt table, with normal with no objective sign for dysautonomia (3F/17). His 8-17 cervical spine magnetic resonance imaging revealed only mild degenerative disc disease without any stenosis and with a cord signal that was unremarkable (3F/17, 67). His thoracic spine magnetic resonance imaging showed multiple disc disease with protruded discs but none causing significant stenosis and with a cord signal that was unremarkable (3F/17, 66). His left foot x-rays showed no acute osseous abnormality (24F/22). In 10-17, he reported a history of agoraphobia that began after muscle chest pain and arm pain in July 2016, after which he subsequently began having issues with dizziness, lightheadedness, and falling; arm shaking when driving in traffic; twitching and shaking when standing; problems blacking out and seeing spots when driving (1F/1). At the hearing, his testimony supports agoraphobia with severe symptoms less than 12 months given the improvement with treatment. Diagnoses were added largely in response to his subjective reports of symptoms. Thus, there are references to major depressive disorder, agoraphobia, unspecified disruptive impulse control, and conduct disorder, asthma, hypertension, bone/joint problems/fibromyalgia, stomach/bowel problems, and temporary ischemic attack (unsupported by testing) (1F/19).

. . .

Following his alleged onset date, the record documents numerous healthcare visits, including emergency department visits and specialist visits (neurology, cardiology, urology, and optometry) for various complaints/diagnoses, including gastroenterology complaints, urinary urgency, chronic fatigue syndrome, fecal incontinence, back pain, facial weakness, dizziness/lightheadedness, numbness/tingling, tremors, headaches, and impaired focus/concentration/memory (2F, 3F, 7F, 8F, 10F, 12F-17F, 20F, 21F, 26F, 30F, and 32F).

Notably, on 12-15-17, Stephanus Viljoen, MD, summarized [Plaintiff]'s history of normal/unremarkable diagnostic and exam findings with extensive work-ups by specialists despite [Plaintiff]'s multitude of issues and complaints. It was noted that [Plaintiff]'s brain magnetic resonance imaging of his brain did not show any evidence of strokes or demyelinating process. His cervical spine again showed no significant central canal stenosis. He had very small thoracic disc herniations in the middle thoracic area, but this resulted in no canal stenosis or evidence of cord signal changes, and with the doctor notably "not concerned" about these herniations. Lumbar imaging was also unremarkable. His scoliosis x-rays that day showed overall good coronal and sagittal alignment. He was to try water therapy which may help with his thoracic pain complaints, with no other treatment recommended (3F/57, 120-127). Thus, the doctor recommended only conservative treatment for [Plaintiff]'s subjective pain complaints in a setting of quite mild findings. There is no support for severe back impairments given the objective findings, doctor's

3

comments and treatment history. Other evidence in the record reveals many normal musculoskeletal findings including gait testing.

[Plaintiff]'s 2-13-18 chest x-rays showed no acute abnormality (3F/120). On exam, [Plaintiff] was noted to appear well and in no apparent distress with normal exam findings. He was also alert, oriented, pleasant, and cooperative (13F/7). In March 2018, he had a neuroscience visit, where he was found to have a normal exam including normal coordination, gait, and ability to do tandem walking, normal muscle bulk, tone, and sensation, and normal behavior, mood, alertness, memory, speech, language, attention, conversation, fund of knowledge, and appearance. He was noted to use a cane despite no trouble with his gait, vertigo or dizziness (14F/8). On 5-30-18, [Plaintiff] had substantially normal neurological exam. He had some mild difficulty in short-term recall on testing, but results still fell within the normal range. He had 5/5 strength and normal muscle bulk with no significant involuntary movement and normal coordination. He had a normal full gait evaluation and was able to walk without his cane and even perform heel and toe walking, tandem walking, and get up from an exam chair without assistance. This exam particularly supports the lack of actual medical need for a cane (21F/21, 22). On 5/30/18, his physical exam shows possible sensory polyneuropathy, based on subjective reports, but no other deficits to explain his "symptoms." The examining neurologist Yasushi Kisanuki, M.D. noted that there are no structural, inflammatory, or metabolic abnormality seen from the extensive work-up by Dr. Fahey (3F/21). "I still think that his subjective "memory" difficulty is heavily influenced by his underlying mood/anxiety issues, rather than organic etiology." His body mass index was in the morbid obesity range, with a measured height of 6' and weight of 347 pounds. He had full strength, intact coordination, could walk without a cane with normal gait testing again. The doctor indicated that he had a frank discussion about the discrepancy between his subjective complaints and quite benign and unremarkable exams and test results. Functional neurological disorder was raised as a possibility and then the doctor recommended a psychological evaluation and treatment. Normal test results were listed following the exam (3F/21-28).

. . .

[Plaintiff] presented on 4-15-19 for complaints of hand weakness, myoclonus, hereditary and idiopathic peripheral neuropathy (notably without falling or dysesthesia) (32F). While he alleged feeling that his hand weakness is worse on 7/31/19, he was in no apparent distress on exam and his manual motor testing was confounded by his subjective pain inhibition, with [Plaintiff] wincing in pain with any movement of either upper extremity (16F). Notably, other exams revealed intact strength, tone and no atrophy with regard to all extremities. He also had normal fine motor control, normal speech, normal station and normal gait. His neuromuscular ultrasound was normal with no evidence for right median or ulnar nerve injury (16F/5; 21F/3). His electromyogram had raised the possibility of right carpal tunnel syndrome but "there is significant atypia." His cervical spine showed moderate to severe changes at C5-6 affecting the right neural foramen; there are no

> changes affecting the right neural foramen or central canal (16F/5), and [Plaintiff] was not referred for back pain management. The neurologist wrote, "perhaps weakness is actually pain inhibition due to a non-neurologic cause" (16F/5). Thus, again [Plaintiff]'s subjective complaints were inconsistent with the objective findings despite an extensive and wide variety of testing and work-ups.

(Tr. 23–26). The ALJ also usefully summarized Plaintiff's medical records and symptoms

related to his mental impairments:

> With respect to [Plaintiff]'s mental status functioning, the record documents diagnoses and treatment of major depressive disorder, agoraphobia, unspecified disruptive impulse control, conduct disorder, hoarding disorder, conversion disorder with mixed symptoms, and unspecified anxiety disorder at times. Prescriptions have included Effexor, Trazodone, Xanax, Abilify, Latuda, Pristiq, and Cymbalta. There have been intermittent reports of impaired memory, crying episodes, irritability, suicidal ideation, and lack of energy. He has engaged in cognitive behavioral therapy (1F, 9F, 18F, 25F, 27F, 28F, 29F, and 33F).

> At his 10-31-18 psychology consultative exam, he was diagnosed with bipolar II disorder and agoraphobia. He reported current treatment of counseling and medication. He denied any problems with his work or getting along with others. He alleged having problems with oral instructions, short-term memory, concentration, and multitasking. He reported spending his day helping his wife prior to her work, sorting his comic book collection, going on the computer, reading the news, watching sports, playing videogames, and visiting with family. He said he does not socialize often. He reported sharing the cleaning, cooking and shopping with his wife. He said he rides a scooter. He ambulated with a cane and stated his physical limitations cause him pain. He was cooperative, talkative, and displayed no eccentric or impulsive behavior. [Plaintiff]'s eye contact was good and his facial and gestural expressiveness was normal. His tone of voice was normal. [Plaintiff]'s fine motor skills were unimpaired and his gross motor skills were apparently impaired "due to his reports" of using a cane for balance. [Plaintiff]'s speech was fast and 100% understandable. His receptive and expressive speech was unimpaired. His quality of associations was well organized. [Plaintiff] showed a tearful and distressed affect and began to cry at the interview. He reported feeling guarded, hostile, irritable, restless, and sad. He stated that it takes him 3 hours to fall asleep "when my mind is racing" and gets a total of 10 hours of hours of sleep per night. He reported that most of the time he is sad, anxious, worried, and depressed. [Plaintiff] became very talkative at this point of the evaluation. He reported having crying spells 5 times per month. He said he gets depressed about his health. He is likely to watch sports, read the news, or does "my to do list" when he feels this way. He said he thinks about death. When asked about killing himself, he stated, "I have contemplated suicide several times. I struggle to do daily chores." He said his energy level was at a high level of energy at age 50, stating, "I was the coordinator at work." [Plaintiff] reported that his moods swing from being restless

and nervous to being depressed to being irritated. He reported having racing thoughts and stated, "My mind races at bedtime and it takes me a long time to go to sleep." He was observed to fidget with his fingers and his hands. He reported he frequently shakes his legs. He alleged being agoraphobic, having a short fuse, and worrying a lot about his health and family (6F).

On the objective side at his psychological evaluation, [Plaintiff] was alert and clear, and was oriented to person, place, time, and situation. He was able to recall all three words presented earlier for a delayed recall test. His immediate recall was average as he was able to repeat 8 digits forward and 9 digits backward. His math computation was average as he correctly completed all three basic mental computation tasks. His word association skills and abstract reasoning ability were below average. He correctly identified the current and former presidents of the United States. He was able to answer both social judgement questions. His concentration and persistence on task were good and his pace of task was average. The bulk of the psychological examination involved the repetition of [Plaintiff]'s subjective complaints of symptoms and limitations, which are not consistently reported throughout the record such as the crying spells, thoughts of death and contemplations of suicide, racing thoughts, difficulty with sleep, frequent shaking of legs, and compulsively washing his hands. For example, his diagnosed agoraphobia was entirely on claimant's reports and at the hearing he clarified that limiting symptoms resolved in well under 12 months, and thus would not be supported as a severe impairment. He testified as to severe dyspnea with any movement of his body as opposed to frequently shaking his legs. He clearly denied suicidal plan or attempt, stating he had no wish to die.

The psychological examiner [John Paulus, Ph.D.] assessed [Plaintiff]'s with undefined "limits," but largely based on [Plaintiff]'s subjective complaints with few abnormal objective findings at the evaluation itself, and with many mild to normal findings in actual treatment notes. Due to his mental health disorders, [Plaintiff] was "limited" in his ability to understand, carry out, and remember instructions; "limited" in his ability to sustain attention and to persist in work-related activity at a reasonable pace; "limited" in his ability to maintain effective social interaction on a consistent and independent basis with supervisors, coworkers, and the public; "limited" in his ability to deal with normal pressures in a competitive work setting. In support, [Plaintiff]'s subjective complaints were relied upon even where he displayed no deficiencies on exam. There is no definition of the "limits" and further treatment of his mental health issues were encouraged. This opinion evidence is not persuasive as unsupported by the largely normal objective findings at this exam, and notably for the inconsistencies of subjective symptoms and reports at this exam compared to others in the record, inconsistencies in mental status exam findings throughout the record, and no real defined limitations with these largely supported by subjective reports of [Plaintiff] at this one-day evaluation (6F). However, the record does support severe mental symptoms that have been addressed with limits in the residual functional capacity

that are well supported by objective evidence and consideration of the actually supported mental deficiencies when viewing the record in its entirety.

[Plaintiff] treated with medication management with Dr. Perkins for major depressive disorder without psychotic features and agoraphobia unspecified. He had many complaints about his health, including everything hurting, even to breathe and sit still, saying that he was in the grocery store dragging his foot and crying. He did report some improvement in his mood and feeling calmer after medication adjustments (18F/21, 2/20/18). On 4/10/18, he reported being able to get through his son's concert at school and planning to attend graduation the next weekend. He was working on moving his comic collection as his in-laws were planning a visit. On 6/13/18, his mental status exam findings included casual dress, fair grooming, overweight, using cane, normal speech and language, depressed mood, full range affect but tearful at times, normal thought processes and orientation, and no hallucinations, suicidal behaviors or homicidal behaviors (18F/30-32). He reported a good amount of sleep despite disruption by pain, and slightly improved mood on the Latuda, reporting some thoughts of not wanting to be around last week, but denied any current thoughts, intent or plan to harm himself (18F/35-37). In January 2019, he was wincing in pain and using a cane, with a depressed mood that was tearful at times, but other findings were normal. He was still purchasing comics for his collection, but not as many as in the past. However, he mentioned moving multiple boxes full of comics around the house and down to the basement, despite testimony that any body movement is unbearable (18F/51). On 7/17/19, when [Plaintiff]'s family was away for a few days, he spent $700 on comics, admitting that they do not have the money for these purchases and was planning to spend time going [through] boxes to get some ready to sell this week (18F/66).

Counseling notes from Mr. Lencke, LPPC, reveal that claimant presented as anxious as anxious and irritable on 1/18/19, with [Plaintiff] explaining that his mind has been "going nonstop." He described his mood lately as having been disagreeable, though somewhat better. He reported that the improvement in his mood could be related to the increase in the Latuda dose over the last week. He acknowledged that there is probably a seasonal component to the depression symptoms. He has noticed increased boredom in almost all his activities. He denied any suicidal ideation in the last 10 days. He made plans to see some of his friends tonight. He also talked about movies that he would like to see. Thus, he continued to make plans for activities. Overall, the counselor noted that there did appear to be a slight decrease in his distress level. He reported improvement in his relationships with his children (25F/3). Notes from 2-11-19 reveal that [Plaintiff] reported benefit from his counseling sessions and was noted to continue to make progress (25F). [Plaintiff] was making good use of psychoeducational materials (25F/7). Notes from 6-19 indicated that he worked on repairing his computer at home (25F/12). Mental status exam findings from 6/4/19 indicate [Plaintiff]'s self-reported symptoms of depressed mood, with occasional thoughts of not wanting to be around but a denial of any intent or plan to harm himself. While he reported a depressed mood, his affect was now full, although he was tearful at times. He had normal

thought processes, no hallucinations, normal orientation, normal attention and concentration, normal memory, normal fund of knowledge and good judgment and insight (18F/59). While he elsewhere alleged limited interests, when encouraged by his wife to get to the counseling session, he admitted to being pleasantly surprised to notice that he felt an increase in motivation and energy related to the problem-solving discussion, and expressed the intention to resume reading the DBT materials (25F/16). Thus, [Plaintiff]'s admitted improvement with treatment is inconsistent with reports of Mr. Lencke, his counselor and objective mental status exam findings noted here and elsewhere.

Mental status exam findings noted by treating psychiatrist, Dr. Perkins, include a depressed mood and thoughts of not wanting to be around without any intent or plan to harm himself, but normal orientation, attention, memory, judgment, insight, fund of knowledge, thought processes, speech, language and affect (27F/29). On 3/12/20, [Plaintiff] reported that anxiety about his upcoming disability hearing may be contributing to some worsening of physical and mental health symptoms, and was encouraged to focus on his support from friends, family and providers (28F/1). Thus, while [Plaintiff] has made progress per his own reports and mental status exam findings, he does have residual mental health symptoms that must be addressed with appropriate limitations in the mental residual functional capacity. His testimony as to very limited daily activities as a result of his impairments are contradicted to the variety of activities revealed in his actual treatment notes.

(Tr. 26–29).

### C. The ALJ's Decision

The ALJ found that Plaintiff meets the insured status requirement through September 30, 2024, and has not engaged in substantial gainful employment since his alleged onset date of November 24, 2017. (Tr. 17). The ALJ determined that Plaintiff has the following severe impairments: obesity, a neurological disorder, and mental impairments best described as an anxiety disorder, an obsessive-compulsive disorder, and a depressive disorder. (*Id.*). The ALJ, however, found that none of Plaintiff's impairments, either singly or in combination, meet or medically equal a listed impairment. (Tr. 18).

As to Plaintiff's residual functional capacity ("RFC"), the ALJ opined:

[Plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except occasional climbing of ramps and stairs and never any ladders, ropes, and scaffolds; frequent balancing, stooping, crouching and crawling;

no commercial driving, no exposure to moving machinery or unprotected heights; retains the ability to perform simple repetitive tasks in a work environment free of fast pace production requirements and involving only simple work related decisions with few if any work place changes; retains the ability to respond appropriately to supervisors and co-workers in a goal-oriented setting with no public contact and occasional interaction with co-workers sufficient for the appropriate exchange of information.

(Tr. 20).

Upon "careful consideration of the evidence," the ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [his] symptoms are not entirely consistent with the medical evidence." (Tr. 21). Relying on the vocational expert's testimony, the ALJ determined that Plaintiff was unable to perform his past relevant work as a software engineer, but he could perform other jobs that exist in significant numbers in the national economy such as a mail clerk, sorter or hand packer. (Tr. 34–35). He therefore concluded that Plaintiff has not been under a disability, as defined in the Social Security Act, at any time since November 24, 2017. (Tr. 35).

## II.     STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). The Commissioner's findings of fact must also be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). To this end, the Court must "take into account whatever in the record fairly detracts from [the] weight" of

the Commissioner's decision. *Rhodes v. Comm'r of Soc. Sec.*, No. 2:13-cv-1147, 2015 WL 4881574, at *2 (S.D. Ohio Aug. 17, 2015).

## III. DISCUSSION

Plaintiff raises one central assignment of error. He says the ALJ erred at step three of the sequential evaluation in finding that Plaintiff did not meet or equal Listings 1.02 and 12.04. (Doc. 10 at 1–7). He argues that the evidence of record is such that the ALJ's step three determinations are not supported by substantial evidence. (*Id.*). As ancillary concerns, which relate back to the strength of evidence before the ALJ at step three, Plaintiff says: (1) the opinions of mental health providers Dr. Tara Perkins and Scott Lencke, LPCC should have been afforded greater weight (*id.* at 7–8); (2) the ALJ did not assign enough weight to Plaintiff's hearing testimony (*id.* at 8); and (3) the ALJ improperly relied on Plaintiff's activities of daily living to find that he did not meet the listings (*id.* at 9). The Undersigned considers each argument in turn.

### A. Step Three

At step three, the ALJ must compare a claimant's impairments to an enumerated list of medical conditions that the Social Security Administration has deemed "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. § 404.1525(a). Each Listing describes "the objective medical and other findings needed to satisfy the criteria of that listing." 20 C.F.R. § 404.1525(c)(3). A claimant will be found disabled if his impairments meet or equal a listing in the Listing of Impairments. 20 C.F.R. § 404.1520(a)(4)(iii); *Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 491 (6th Cir. 2010). The claimant bears the burden of showing that his impairment meets or medically equals a Listing. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). And a claimant must satisfy

*all* of the criteria to "meet" the listing.  20 C.F.R. § 404.1525(c)(3); *Rabbers v. Comm'r of Soc. Sec. Admin.*, 582 F.3d 647, 653 (6th Cir. 2009).

**1.  Listing 1.02**

Plaintiff argues that the ALJ committed reversible error in failing to find him disabled under Listing 1.02, which provides:

> 1.02 Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joints(s). With:
>
> A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;
>
> or
>
> B. Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 100.B2c.

20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 1.02.  An inability to ambulate effectively means an "extreme limitation of the ability to walk."  20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 1.00B2b(1). Ineffective ambulation is generally defined "as having insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device(s) that limits the function of both upper extremities."  *Id.*  An inability to perform fine and gross movements effectively means an "extreme loss of function of both upper extremities; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities."  20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 1.00B2c.  Examples include "the inability to prepare a simple meal and feed oneself, the inability to take care of personal hygiene, the inability

to sort and handle papers or files, and the inability to place files in a file cabinet at or above waist level." *Id.*

Here, the ALJ concluded that "[t]he objective findings on exam, testing, or imaging fail to support the criteria of any of the listings. There is no evidence of a major dysfunction of a joint(s) or a disorder of the spine resulting in [Plaintiff]'s inability to ambulate effectively, as defined in 1.00B2b, or resulting in [Plaintiff]'s inability to perform fine and gross movements effectively, as defined in 1.00B2c." (Tr. 18). Plaintiff says, however, "[t]he longitudinal evidence bears out that [he] suffers from disorganization of all of his extremities and has an extreme limitation balancing, standing/walking, and using his upper extremities." (Doc. 10 at 3). The Commissioner counters that "[o]verall, the 'many normal musculoskeletal findings' in the record . . . substantially support the ALJ's conclusion that Plaintiff's impairments did not satisfy [L]isting 1.02." (Doc. 11 at 6) (quoting Tr. 24). The Undersigned agrees with the Commissioner that the ALJ's conclusion is supported by substantial evidence.

The ALJ first considered the Plaintiff's subjective reporting of pertinent symptoms. For instance, he noted the Plaintiff testified:

> [H]e frequently but intermittently cannot use his hands and arms to grip, hold things, and struggles to type on an IPad. He said he has daily problems with his legs more frequently with movement. He said he struggles to walk to use the bathroom. He said he now has a cane for balance and support due to lack of strength. He said he worries that he may fall and impale himself on it considering how often he falls.

(Tr. 21). The ALJ further detailed how these subjective complaints of challenges with the upper and lower extremities were detailed in Plaintiff's medical records. Yet, those subjective complaints appeared to be continually refuted by objective testing and other statements made by Plaintiff. For example, in an October 2018 examination, Plaintiff "alleged difficulty walking on hard surfaces or uneven terrain. However, he also said he will occasionally go shopping and does drive, which seems inconsistent with the extent of other symptoms and limitations alleged." (Tr. 22) (citing Tr.

1124–33).  At that same examination, "[h]e demonstrated a normal gait without use of ambulatory aid, with normal heel and toe walking, no evidence of foot drop, and no risk of falling. . . .  He had normal range of motion in every single joint tested, normal grasp and manipulation, no abnormality in the joints . . . ."  (*Id.*) (citing Tr. 1124–33).

Similarly, in March 2018, at a neurological examination, Plaintiff was found to have normal coordination, normal gait (despite using a cane), the ability to do tandem walking, 5/5 motor strength in both upper and lower extremities with normal muscle bulk and tone.  (Tr. 24) (citing Tr. 1197).  The same findings were reflected in a May 2018 examination, with the ALJ noting that the exam "particularly supports the lack of actual medical need for a cane."  (*Id.*) (citing Tr. 1393–94).  Indeed, as that examiner noted, if Plaintiff "is encouraged, he can walk without a cane," and that there was "frankly [a] discrepancy between [Plaintiff's] subjective symptoms and exam/test results (latter being quite benign/unremarkable)[.]"  (Tr. 1394).

Still more, some of Plaintiff's self-reported activities seemed to underscore that he did not meet the criteria for Listing 1.02.  While an inability to perform fine and gross movements, for example, may be demonstrated by the inability to handle papers and files or prepare a meal, the ALJ noted Plaintiff reported "spending his day . . . sorting his comic book collection," and "sharing the cleaning, cooking and shopping with his wife."  (Tr. 26) (citing Tr. 614).  All told, the ALJ identified substantial evidence in the record to demonstrate that Plaintiff had neither an inability to ambulate effectively nor an inability to perform fine and gross movements, and thus he did not meet or equal Listing 1.02.

To the extent Plaintiff attempts to identify other points in the record to support an opposing conclusion, (*see, e.g.* Doc. 10 at 3–5), he primarily relies on doctor's recitations of his subjective symptoms.  Nothing he identifies, nor anything the Undersigned found upon independent review,

13

so undermines the supporting evidence put forth by the ALJ as to make the ALJ's conclusion unreasonable. Accordingly, the Undersigned finds no merit in Plaintiff's allegation that the ALJ erred in finding that he did not meet or equal Listing 1.02.

### 2. Listing 12.04

Plaintiff also asserts that the ALJ committed reversible error in failing to find him disabled under Listing 12.04, which establishes the criteria for depressive, bipolar, and related disorders. *See* 20 C.F.R. Pt. 404, Subpt. P, App'x 1, §§ 12.00(A), 12.04. To meet the Listing's severity level for these disorders, a claimant must show that he meets: (1) the impairment-specific medical criteria in paragraph A; and (2) the functional limitations criteria in paragraph B or the "serious and persistent" disorder criteria in paragraph C. *See* 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00(A). Stated differently, a claimant must demonstrate that he meets the requirement of Paragraphs A and B, or Paragraphs A and C, of Listing 12.04 to show that his impairments meet the Listing criteria.

Here, the ALJ explicitly determined that Plaintiff did not meet or equal the criteria of Listing 12.04. (Tr. 18). Having already found that depressive disorder was one of Plaintiff's severe impairments (Tr. 17), the ALJ considered whether it, as well as Plaintiff's other mental impairments, satisfied the Paragraph B (Tr. 18–20) or Paragraph C (Tr. 20) criteria.

### a. *Paragraph B*

First, when considering the Paragraph B requirements, an ALJ uses a five-point scale (none, mild, moderate, marked, and extreme) to rate a claimant's degree of limitation in the four following areas of mental functioning: (1) understand, remember or apply information; (2) interact with others; (3) concentrate, persist or maintain pace; (4) adapt or manage oneself. 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.00(A)(2)(b). To satisfy that Paragraph B criteria, an ALJ must rate a

claimant as having extreme limitations in one of these four areas or marked limitations in two of them.

In this case, the ALJ found that Plaintiff did not meet the Paragraph B criteria for Listing 12.04 because Plaintiff did not have an extreme limitation in any of the four functional areas or marked limitations in any two of them. Rather, the ALJ found that Plaintiff had only moderate limitations in adapting or managing oneself, interacting with others, and concentration, persistence or maintaining pace—and only mild limitation in understanding, remembering, or applying information. (Tr. 19). The ALJ adopted these limitations in part based on the reports of the state agency psychological consultants. (*Id.*) (citing Tr. 67–81, 83–98). He considered these reports in conjunction with Plaintiff's self-reported symptoms, activities of daily living, and mental status exam findings:

> The State agency psychological consultants noted that while [Plaintiff] reported problems with memory, both short-term and long-term memory were intact based on treating sources' notes and his presentation at the psychological evaluation where he computed all math problems accurately and had no problems recalling his psychosocial history. They concluded that while [Plaintiff] may have a subjective sense of memory problems, it is not evidenced in the medical record. They noted that [Plaintiff] drives, uses the computer, reads the news and plays videogames. (1A, 3A).
>
> [Plaintiff], although making improvements, was tearful at some treatment sessions. However, he was able to relate well, improve his relationships, and mentioned get togethers with friends, some shopping in person and online, and attending school events with large groups of people. On 2/1/19, Scott Lencke, LPCC, a mental health counselor, completed a "daily questionnaire" that largely reflects [Plaintiff]'s subjective complaints and alleged limitations. For example, the counselor noted, "positive reviews from supervisors…took on extra responsibilities.. enjoyed collaboration with co-workers." As far as social events, [Plaintiff] reported often staying home when family leaves for visits with other family, but spends a few hours at a time with his friends where they eat meals, watch movies, or play cards (9F). A moderate limitation in interacting with others is best supported by the overall record. There are reports he reads, watches the news, uses the computer, even fixing it on one occasion, plays videogames, shops, drives, and reads material for treatment purposes. He has been found to have intact memory, attention and concentration overall, although he alleges subjective memory loss. He did present with a depressed mood at visits and did mention general thoughts of not wanting to be here, but denied

15

any plan, intent or actual attempt. He did complain of loss of interest in activities, but continued to order more comic books for his collection, and resell some of them given the lack of money or room to store them all. He continued mentioning friends and activities, limited largely by his reports of physical pain and limitations. As he seems to struggle with stress largely from situational stressors, he was working on coping skills and appears moderately limited in his ability to adapt and manage himself. Given the combination of his impairments, including consideration of pain reports and subjective loss of memory or attentional issues despite relatively normal findings in these areas, he has been found moderately limited in concentrating, persisting, and maintaining pace. While he certainly does evidence an ability to maintain attention and concentration at visits, and discusses many activities evidencing some intact abilities in these areas, his combined symptoms would likely affect his ability to work in a setting of fast pace production requirements. He does not have understanding limitations and his memory limitations do seem to be subjectively based and not consistent with most mental status exam findings. He did well at the psychological examination as far as cognitive testing and only a mild limitation can be found in understanding, remembering and applying information (6F).

(Tr. 19–20).

In other words, the ALJ carefully walked through the record, including Plaintiff's subjective complaints, self-reported activities, objective examinations, and the reports of several psychological consultants and providers, and reasoned why he found Plaintiff to be only moderately limited or mildly limited in each area of functioning.  Plaintiff, however, maintains that "[t]he records establish extreme limitations of [his] ability to interact with others as well as . . . to adapt and manage oneself . . . ."  (Doc. 10 at 7).  Particularly, he says that the opinions of mental health providers Dr. Tara Perkins and Scott Lencke, LPCC, both of whom found that Plaintiff had marked or extreme limitations in some areas of functioning (Tr. 1615–17, 1658–60), should have been afforded greater weight.  (Doc. 10 at 6–8).  Yet, the ALJ's opinion properly explains how those opinions were considered and ultimately deemed unpersuasive.

Regarding medical opinions, an ALJ is not required to "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative finding(s) including those from [Plaintiff]'s medical sources."  20 C.F.R. § 404.1520c(a).  Instead,

16

an ALJ must use the following factors when considering medical opinions or administrative findings: (1) "[s]upportability"; (2) "[c]onsistency"; (3) "[r]elationship with [Plaintiff]"; (4) "[s]pecialization"; and (5) other factors, such as "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of [the SSA's] disability programs policies and evidentiary requirements." 20 C.F.R. § 404.1520c(c)(1)–(5). Although there are five factors, supportability and consistency are the most important, and the ALJ must explain how they were considered. 20 C.F.R. § 404.1520c(b)(2). Supportability considers the relevant objective medical evidence and supporting explanations provided in conjunction with the opinion. 20 C.F.R. § 404.1520c(c)(1). Consistency considers how consistent the opinion is with the other evidence in the record. 20 C.F.R. § 404.1520c(c)(2). Although an ALJ may discuss how he or she evaluated the other factors, he or she is not generally required to do so. 20 C.F.R. § 404.1520c(b)(2).

About the opinion of Dr. Perkins, which was provided in the form of a "mental residual functional capacity questionnaire[,]" the ALJ noted that it was not "supported by [Dr. Perkins'] own mental status exam findings nor consistent with [her] own notes, the [Plaintiff's] reports and [his] activities of daily living, and thus the opinion evidence is unpersuasive." (Tr. 32). In other words, the opinion tended to rank low on supportability because it did not align with the relevant objective evidence, that is, Dr. Perkins' own mental status exam findings, and because generally "[n]o rationale was provided[]" in conjunction with the questionnaire's conclusions. (*Id.*). For instance, though Dr. Perkins noted moderate and marked limitations in understanding and memory on her questionnaire (Tr. 1658), she regularly reported in her mental status exam findings that Plaintiff's "Memory/Fund of Knowledge" was "Normal" (Tr. 1242, 1249, 1265, 1275, 1282, 1296, 1304). The ALJ was further puzzled by the suggestion in the doctor's opinion that though Plaintiff

was significantly impacted in his day-to-day functioning, he was also capable of managing benefits in his own interest should they be awarded.  (Tr. 32) (citing Tr. 1661).

Plaintiff maintains that the ALJ erred in not considering the supportability of a Global Assessment of Functioning ("GAF") rating provided by Dr. Perkins in her questionnaire.  (Doc. 10 at 6) (citing Tr. 1657).  But a GAF rating is not objective medical evidence.  Rather, it is "a subjective determination that represents the clinician's judgment of the individual's overall level of functioning."  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 276 (6th Cir. 2009) (citation omitted). And, like the other subjective determinations in the opinion, it was presented without supporting rationale.

After concluding the opinion rated low on supportability, the ALJ also found the opinion inconsistent with the overall record, including Plaintiff's own reports and activities of daily living which, as described above, the ALJ thought supported only mild and moderate limitations.  (Tr. 32).  Because the ALJ properly explained how he analyzed the supportability and consistency of the opinion, his conclusion that the opinion was unpersuasive is supported.

Mr. Lencke completed a similar mental residual functional capacity questionnaire, in which he found that Plaintiff had marked or extreme limitations in the four areas of mental functioning. (Tr. 1614–18).  The only additional records provided in connection with Mr. Lencke were a daily questionnaire in which "the bulk of the responses are claimant's self-reports and offer little in the way of objective evidence[,]" (Tr. 32) (citing Tr. 890–96), and progress notes that were "minimal" and contained "few references to actual mental status exam findings,"  (Tr. 33) (citing Tr. 1549– 64, 1602–13).  Regarding supportability of the material, the ALJ noted that "[n]o objective findings were cited in support[,]" and again that "[n]o explanation was provided nor objective evidence cited."  (Tr. 32–33).  Additionally, like Dr. Perkins' opinion, it seemed internally contradictory

18

because it purported marked and even extreme functional limitations but simultaneously suggested that Plaintiff could manage benefits in his own best interest.  (Tr. 33) (citing Tr. 1618).  Regarding consistency, the ALJ compared the opinion's findings with "mental status exam findings of Dr. Perkins and other providers" and concluded that they were "not consistent with marked to extreme limitations in all areas."  (*Id.*).  The ALJ wrote that "[o]verall, [the opinion] provides very little in the way of functional limitations, provides little support from treatment records, and is largely inconsistent with evidence elsewhere in the record, and thus is unpersuasive."  (*Id.*).  This conclusion was supported by sufficient explanation of how the ALJ analyzed supportability and consistency.

Plaintiff suggests the ALJ was under an obligation to contact Dr. Perkins and Mr. Lencke for "clarification" of their opinions, "instead of rendering their opinions and treatment inadequate without conflicting medical testimony or evidence."  (Doc. 10 at 8).  There is no such obligation. As the Commissioner identifies, "[t]he decision to recontact a medical source is a matter of the ALJ's discretion driven by the adequacy of the record."  (Doc. 11 at 15).  Indeed, an ALJ "may" recontact a medical source "[i]f the evidence in [a Plaintiff's] case record is insufficient . . . ."  20 C.F.R. § 404.1520b(b).  Further, it is incorrect for Plaintiff to suggest that the ALJ rejected the opinions "without conflicting medical testimony or evidence[,]" as the ALJ identified substantial evidence supporting his conclusion for mild and moderate limitations, as detailed above.  Simply put, the record was sufficient for the ALJ to render a decision so there was no need to exercise his discretion to recontact medical sources.

Next, Plaintiff says the ALJ failed to properly consider Plaintiff's own testimony, "label[ing] his testimony in a blanket fashion as not credible despite conformity to the records in evidence."  (Doc. 10 at 8).  The ALJ discussed Plaintiff's hearing testimony particularly in the

opinion.  (Tr. 21) (summarizing hearing testimony); (Tr. 23, 27) (noting hearing testimony about

agoraphobia).   Moreover, he extensively considered Plaintiff's subjective reports of symptoms

throughout his treatment history, as has been described.  Yet, he concluded that:

> [Plaintiff] has alleged a multitude of symptoms and limitations that are not supported
> by the objective evidence of record. While he pointed out supportive opinion
> evidence in his testimony, . . . such opinion evidence is supported almost entirely
> based on subjectively reported symptoms in a setting of unsupportive testings,
> imaging and exam findings.

(Tr. 23).  Nor was this a "blanket" rejection, as Plaintiff maintains.  The ALJ provided reasoning,

often to do with Plaintiff's conflicting self-reported activity and objective mental status exam

findings, whenever he departed from the severity of Plaintiff's alleged symptoms and limitations.

  *b.  Paragraph C*

Plaintiff's final allegation of error relates to the ALJ's conclusion that he did not meet the

Paragraph C criteria for Listing 12.04.  (Doc. 10 at 9).  The Paragraph C criteria requires a showing

of a "serious and persistent" disorder over a period of at least two years, where treatment has been

relied upon on an ongoing basis, and yet a plaintiff has "achieved only marginal adjustment."  20

C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.00(G)(2)(a)–(c).  Marginal adjustment means a "minimal

capacity to adapt to changes . . ." and will be demonstrated "when the evidence shows that changes

or increased demands have led to exacerbation of [a plaintiff's] symptoms and signs and to

deterioration in your functioning[.]"  20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.00(G)(2)(c).

Regarding Paragraph C criteria, the ALJ concluded:

> In this case, the evidence fails to establish the presence of the "paragraph C" criteria.
> The claimant has been able to establish with new providers, seek help when needed,
> attend his appointments, and understand treatment recommendations. He has been
> able to handle the stressors of the psychological examination and the hearing. Mental
> health treatment notes show his attempts to use new coping skills to handle his
> situational stressors. He maintained his appointments (6F, 18F).

(Tr. 20).

20

Plaintiff says that the ALJ erred in weighing Plaintiff's reported daily activities of living and attendance at the psychological examination and hearing in assessing the Paragraph C criteria. (Doc. 10 at 9).  Plaintiff seems to suggest the ALJ concluded that, because Plaintiff was able to attend the hearing and was not "bed-ridden[,]" he must not be disabled.  (*Id.*).  The Undersigned disagrees with this characterization.  The ALJ was clearly assessing how Plaintiff dealt with "changes and increased demands[,]" the central inquiry of Paragraph C.  20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.00(G)(2)(c).  It was not, therefore, Plaintiff's mere attendance at the hearing that was dispositive of this issue.  Rather, the ALJ, through observation of Plaintiff at the hearing, believed he was handling "the stressors of . . . the hearing."  (Tr. 20).  Still more, the ALJ relied on material outside of the hearing, like treatment notes suggesting that Plaintiff was able to integrate "new coping skills to handle situational stressors[,]" in arriving at his conclusion.  (*Id.*).  The ALJ supported his conclusion that Plaintiff did not meet the criteria for Paragraph C with substantial evidence.

At base, the ALJ identified substantial evidence in the record to demonstrate that Plaintiff satisfied neither the criteria for Paragraph B or C, and thus he did not meet or equal Listing 12.04. Nothing Plaintiff identifies in his Statement of Errors, nor anything the Undersigned found upon independent review, so undermines the supporting evidence put forth by the ALJ as to make the ALJ's conclusion unreasonable.  Accordingly, the Undersigned finds no merit in Plaintiff's allegation that the ALJ erred in finding that he did not meet or equal Listing 12.04.

## IV.  CONCLUSION

Based on the foregoing, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

## V.    PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s). A District Judge of this Court shall make a de novo determination of those portions of the Report or specific proposed findings or recommendations to which objection is made. Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

IT IS SO ORDERED.


Date:   July 22, 2022                              /s/ Kimberly A. Jolson
                                                   KIMBERLY A. JOLSON
                                                   UNITED STATES MAGISTRATE JUDGE